UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TYVON ELISIAS,

      Plaintiff,

v.                                    Case No. 3:25-cv-560-JEP-LLL

SERGEANT R. FISHER, et al.,

      Defendants.

_____

## ORDER

Plaintiff Tyvon Elisias, an inmate of the Florida Department of Corrections ("**FDOC**"), is proceeding on a pro se Amended Complaint for Violation of Civil Rights ("**Amended Complaint**," Doc. 9) and a Motion for Preliminary Injunction ("**Motion**," Doc. 10).

In the Amended Complaint, Plaintiff alleges violations of his First, Eighth, and Fourteenth Amendment rights based on an incident that occurred on July 28, 2024, at Columbia Correctional Institution ("**Columbia C.I.**") Annex. (Doc. 9 at 3). Plaintiff names the following individuals as Defendants in their individual and official capacities: (1) Sergeant R. Fisher ("**Fisher**"); (2) Correctional Officer Trainee (Jane Doe) Simpson ("**Simpson**"); (3) Captain (John Doe) Minnic ("**Minnic**"); (4) Dr. (John Doe) Baker ("**Dr. Baker**"); (5)

Nurse (Jane Doe) Mathis ("**Nurse Mathis**"); and (6) Medical Director Felix Cruz ("**Cruz**"). (*Id.* at 1–4).

On the morning of July 28, 2024, Plaintiff approached Fisher and informed her of "an ongoing conflict between Plaintiff and inmate Luis Toledo," to which Fisher replied, "Keep it off camera." (*Id.* at 12). Later that day, Fisher stepped away from the dorm, leaving Simpson alone at the officer's station. (*Id.*). At approximately 1:30 p.m., "some words were exchanged between Plaintiff and inmate Toledo, and threats were made towards Plaintiff, at which point, Plaintiff approached" Simpson and "requested protection." (*Id.*). Then, the following events took place:

> Simpson . . . buzzed the inner Wing-2 sallyport (hallway) door, and allowed Plaintiff to go into the Wing-2 sallyport, where Plaintiff (looking through the outer plexiglass window), noticed Fisher (the O-Dorm supervisor), and Manning (the shift [officer-in-charge]) standing outside at the center gate of the compound, at which point, Simpson buzzed the restricted security door (that remains locked) separating Wing-2 [and] Wing-1 of O-Dorm, allowing inmate Toledo to go from Wing-2 over to Wing-1 where inmate Toledo then gathered about 5 or 6 other (armed) inmates housed in Wing-1, to accompany inmate Toledo, back through the restricted security door from Wing-1 over to Wing-2, who then positioned themselves in the Wing-2 bathroom (where there's no cameras), where through the plexiglass window in the bathroom, that's connected to the sallyport, inmate Toledo began to bang and yell profanity at Plaintiff through the plexiglass (as the O-Dorm Wing-2 dayroom [and] bedding area cameras will show).
>
> Simpson (still alone in the O-Dorm officer's station) then again buzzed the inner Wing-2 sallyport door, and pointed inside directing Plaintiff to return into Wing-2, whereupon Plaintiff re-

entering Wing-2 (as directed by Simpson), inmate Toledo and his armed companions began telling Plaintiff to "come in the bathroom" (off camera), repeatedly stating to Plaintiff "today we [are] gonna [sic] get [your] ass from around here." [A]fter some convincing from another (uninvolved) inmate, inmate Toledo's companions returned through the restricted security door (buzzed by Simpson) back over to Wing-1 (as the O-Dorm Wing-2 dayroom [and] bedding area cameras will show).

Approximately 15 minutes later, inmate Toledo covertly approached Plaintiff from behind, whereas, Plaintiff turned around, inmate Toledo stabbed Plaintiff in the left temple of his face. Plaintiff then turned and ran for safety directly in front of the officer's station (occupied by Simpson who was watching), while still being chased and repeatedly stabbed by inmate Toledo, as Plaintiff ran into the dayroom and stood on top of the tables, while still being pursued and assaulted by inmate Toledo, directly in front of the O-Dorm officer's station in Wing-2, as Simpson simply watched (as the O-Dorm Wing-2, bedding area, officer's station, and dayroom cameras will show).

Eventually, Plaintiff ran out of the Wing-2 dayroom back into the bedding area, where Plaintiff (bleeding profusely) lost his balance and fell, at which point, inmate Toledo caught to, and then stood over and repeatedly stabbed Plaintiff multiple times, before Simpson decided to call in inmate Toledo's armed assault against Plaintiff as a simple fight (as the Wing-2 O-Dorm cameras will show).

Inmate Toledo was pulled away from Plaintiff by another inmate, at which point, Plaintiff stood and stumbled into the Wing-2 sallyport and waited for a delayed security and medical response (as the O-Dorm Wing-2, bedding area [and] sallyport cameras will show).

Upon security responding to the incident, Plaintiff[,] being unable to walk[,] was carried handcuffed by staff to the Columbia C.I. Annex Medical Unit, while losing and regaining consciousness due to a massive loss of blood sending Plaintiff into shock.

3

Plaintiff was then met by Minnic and other officers who began questioning Plaintiff about the stabbing incident. When Plaintiff mentioned Fisher (the O-Dorm supervisor), Minnic replied[,] "she was with me." Plaintiff was then rushed by [an] ambulance to an outside hospital (Lake City H.C.A.), where Plaintiff was treated for multiple stab wounds, including a stab wound to his right hand that left a fractured bone and permanent disfigurement, [for] which Plaintiff was given sutures, and had a cast placed on his right hand with ace bandages, and then prescribed Ibuprofen for pain, at which point, Plaintiff advised Hospital staff that Plaintiff was allergic to Ibuprofen, where Plaintiff was advised that the doctor attending him had ended [his] shift and was done for the day, and the nurse made note on the prescription, along with Plaintiff's discharge papers.

Plaintiff was transported back to Columbia C.I. Annex, and taken directly to the Medical Unit, to see the on[-]duty nurse, who made a memo in the computer documenting Plaintiff's allergy. Plaintiff was then escorted to the Columbia C.I. Annex, N-Dorm Confinement Unit, and placed in cell 2207, where he remained until being examined by Dr. Baker the next day (July 29th, 2024).

Dr. Baker examined Plaintiff's wounds[] and right hand[,] which was dressed in a cast and ace bandages. Dr. Baker then stated to Plaintiff that he'd seen the memo of Plaintiff's allergies, but informed Plaintiff that he'd . . . already ordered Plaintiff's medication, and directed Plaintiff not to take the Ibuprofen, but instead gave Plaintiff a few packs of (2 capsule) non[-]aspirin pills.

Plaintiff was then taken back to confinement where Plaintiff remained without being provided any necessary wound care or pain medication, [and] the Columbia C.I. Annex Medical Unit[] refused to acknowledge and fulfill any "sick call (medical) request" submitted by Plaintiff seeking medical attention[] [on August 5, 6, 12, 13, and 19, 2024]. Plaintiff repeatedly tried to request medical attention from Nurse Mathis as she made her daily rounds in Wing-2 of N-Dorm[.] [On August 19, 2024], upon Plaintiff requesting medical attention from Nurse Mathis . . . , Nurse Mathis stated[,] "You don't need it for the scratches[.] . . . Grieve it again." . . . .

4

> On August 15th, 2024, . . . Plaintiff met with Dr. Baker, who[] stated . . . that he  . . . "had thrown away his suture removers" and "would have to reschedule" Plaintiff "for the [following] week."
>
> After Plaintiff began to complain [that] Dr. Baker . . . removed Plaintiff's cast and ace bandages used to keep Plaintiff's swollen[,] fractured [hand] in position, [and] inquir[ed] about Dr. Baker's intentions to re-wrap and stabilize Plaintiff's fractured hand with some form of protection, Dr. Baker stated [that] Plaintiff "did not need it" (re-wrapping)[.] [U]pon Plaintiff [expressing] his concerns to Dr. Baker that Plaintiff's right hand was still fractured and currently causing Plaintiff a great deal of pain and needed pain medication, Dr. Baker then stated that Plaintiff "could get some non-aspirin from security staff," whereupon, Plaintiff was rushed out of the N-Dorm medical (triage) room[] without anything covering or supporting Plaintiff's painful, swollen, fractured hand, which as a result caused Plaintiff to endure and suffer countless painful, restless agonizing nights (as the N-Dorm Wing-2 cameras will show Plaintiff leaving with cast and returning without cast).
>
> On August 23rd, 2024, Plaintiff was escorted . . . to meet with Dr. Baker and have the sutures removed . . . . Once Dr. Baker had removed the sutures from Plaintiff's hand, Plaintiff asked Dr. Baker to issue Plaintiff a "low bunk pass" due to Plaintiff being unable to climb onto an upper bunk with a fractured hand. . . . Dr. Baker replied: "I'm not issuing a pass for a broken hand." Plaintiff then inquired about some sort of protection for Plaintiff's hand, to which Dr. Baker responded[,] "Ace bandages are no longer allowed at Columbia C.I. . . . There's nothing I could give you." Thereby [sic] leaving Plaintiff's still fractured[,] swollen hand exposed and permanently disfigured.

(*Id.* at 12–17 (names abbreviated; paragraph numbering omitted)).

Based on these allegations, Plaintiff appears to bring claims of failure to protect or intervene in the July 28, 2024 incident against Fisher, Simpson, and Minnic; claims of deliberate indifference to a serious medical need against Dr.

Baker, Nurse Mathis, and Cruz; and claims of retaliation against Dr. Baker and Nurse Mathis. (*Id.* at 8–10, 17). As to Dr. Baker, Plaintiff alleges that in retaliation for Plaintiff's filing of medical grievances, Dr. Baker deliberately: (1) refused to prescribe an alternative pain medication despite his awareness of Plaintiff's allergy to Ibuprofen; (2) removed Plaintiff's cast from his right hand prematurely, resulting in permanent disfigurement; and (3) refused to provide a new cast and a lower bunk pass. (*Id.* at 9–10). As to Nurse Mathis, Plaintiff alleges that in retaliation for Plaintiff's filing of medical grievances, she deliberately refused to: (1) process Plaintiff's medical sick-call requests; and (2) provide daily wound care. (*Id.* at 10). Finally, as to Cruz, Plaintiff alleges that he was deliberately indifferent to Plaintiff's medical needs by denying his grievances. (*Id.* at 10, 17). As relief, Plaintiff requests compensatory damages in the amount of $175,000 against each Defendant, and "a declaratory judgment certifying Plaintiff's rights to protection and adequate medical treatment."[1] (*Id.* at 11).

The Prison Litigation Reform Act ("**PLRA**") requires the Court to dismiss an action at any time if the Court determines that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or

---

[1] Plaintiff alleges he suffered multiple stab wounds to his left temple, back, torso, and hand; a fractured bone and permanent disfigurement in his right hand; anxiety; and emotional distress. (Doc. 9 at 11).

6

seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B). With respect to whether a complaint "fails to state a claim on which relief may be granted," § 1915(e)(2)(B)(ii) mirrors the language of Federal Rule of Civil Procedure 12(b)(6), and, therefore, courts apply the same standard in both contexts. *Mitchell v. Farcass*, 112 F.3d 1483, 1490 (11th Cir. 1997); *see also Alba v. Montford*, 517 F.3d 1249, 1252 (11th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Labels and conclusions" or "a formulaic recitation of the elements of a cause of action" that amount to "naked assertions" will not do. *Id.* (quotations, alteration, and citation omitted).

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). The factual allegations in a complaint must be "simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). All reasonable inferences should be drawn in favor of the plaintiff. *See Randall v. Scott*, 610 F.3d 701,

705 (11th Cir. 2010). While "[s]pecific facts are not necessary," the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555).

Moreover, a complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001) (quotations and citations omitted). Further, "conclusory allegations, unwarranted deductions of facts, or legal conclusions masquerading as facts will not prevent dismissal." *Rehberger v. Henry Cnty., Ga.*, 577 F. App'x 937, 938 (11th Cir. 2014)[2] (quotations and citation omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." *Iqbal*, 556 U.S. at 678, 680.

In assessing a pro se party's pleadings, the court must read the allegations in a liberal fashion. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011). However, the duty

---

[2] Any unpublished decisions cited in this Order are deemed persuasive authority on the relevant point of law. *See McNamara v. GEICO*, 30 F.4th 1055, 1061 (11th Cir. 2022).

of a court to construe pro se pleadings liberally does not require the court to serve as an attorney for the plaintiff. *Freeman v. Sec'y, Dept. of Corrs.*, 679 F. App'x 982, 982 (11th Cir. 2017) (citing *GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) the defendant deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law. *See Salvato v. Miley*, 790 F.3d 1286, 1295 (11th Cir. 2015); *Bingham*, 654 F.3d at 1175 (citation omitted); *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010) (citations omitted). Moreover, under Eleventh Circuit precedent, to prevail in a section 1983 action, a plaintiff must show "an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation." *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (citation omitted); *Porter v. White*, 483 F.3d 1294, 1306 n.10 (11th Cir. 2007).

Under the Eighth Amendment, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). As it relates to medical care, "the Supreme Court has held that

prison officials violate the bar on cruel and unusual punishments when they display 'deliberate indifference to serious medical needs of prisoners.'" *Keohane v. Fla. Dep't of Corrs. Sec'y*, 952 F.3d 1257, 1265 (11th Cir. 2020) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To establish liability on an Eighth Amendment deliberate indifference claim, the plaintiff must show: (1) "that he suffered a deprivation that was[] 'objectively, 'sufficiently serious'"; and (2) "the defendant acted with 'subjective recklessness as used in the criminal law.'" *Wade v. McDade,* 106 F.4th 1251, 1261–62 (11th Cir. 2024) (quoting *Farmer*, 511 U.S. at 834, 839). Under the criminal-recklessness standard, the inmate must "prove that the defendant prison official *actually* knew of a substantial risk of serious harm, not just that he *should have known*." *Id.* at 1257 (emphasis in original). Further, "a deliberate-indifference plaintiff must show that the defendant official was subjectively aware that his own conduct—[] his own actions or inactions—put the plaintiff at substantial risk of serious harm." *Id.* at 1258, 1262. Nevertheless, a defendant, who "actually knew of a substantial risk to inmate health or safety," cannot be found liable under the Cruel and Unusual Punishments Clause, if he "responded reasonably to the risk." *Id.* at 1262 (quoting *Farmer*, 511 U.S. at 844–45).[3]

---

[3] To the extent prior Eleventh Circuit deliberate indifference cases are not inconsistent with *Wade*, "they should continue to be cited as binding precedent." *Wade*, 106 F.4th at 1265 (Jordan, J., concurring).

"Accidents, mistakes, negligence, and medical malpractice are not 'constitutional violation[s] merely because the victim is a prisoner.'" *Harris v. Coweta Cnty.*, 21 F.3d 388, 393 (11th Cir. 1994) (quoting *Estelle*, 429 U.S. at 105). Additionally, when a prisoner receives medical care "and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Hoffer v. Sec'y, Fla. Dep't of Corrs.*, 973 F.3d 1263, 1272 (11th Cir. 2020). For instance, "whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting *Estelle*, 429 U.S. at 107). Similarly, "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment." *Hoffer*, 973 F.3d at 1273 (alteration in original) (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991)).

Pursuant to the Court's screening obligation, the Court will dismiss without prejudice all claims in the Amended Complaint except the individual-capacity claims of failure to protect or intervene against Fisher and Simpson. With respect to Plaintiff's claims of deliberate indifference against Dr. Baker,

11

Nurse Mathis, and Cruz, the Court finds that the allegations in the Amended Complaint, construed liberally, are insufficient to state a plausible claim for relief. Plaintiff does not sufficiently allege that Dr. Baker and Nurse Mathis knew of a substantial risk of serious harm to Plaintiff, or that they knew that their own conduct put Plaintiff at a substantial risk of serious harm, to support a medical deliberate indifference claim. Plaintiff alleges that he did not receive any pain medication, but admits that he received a few packs of non-aspirin pills on July 29, 2024 (the day after he returned from the outside hospital), and that he could replenish his supply of non-aspirin pills directly from security staff. (Doc. 9 at 15–16). Plaintiff also alleges that Dr. Baker and Nurse Mathis did not provide "any necessary wound care" and refused to fulfill his sick-call requests, but admits that they saw Plaintiff on August 15,[4] 19, and 23, 2024. (Doc. 9 at 15–17; *see also* Doc. 9-1 at 16 (also noting that X-rays were completed on August 29, 2024, and Plaintiff was scheduled to be seen by an orthopedist)). To the extent Plaintiff disputes the adequacy or the course of his treatment, this Court cannot "second guess [the] medical judgments" of Dr. Baker and Nurse Mathis. *Hoffer*, 973 F.3d at 1272. Even if Plaintiff could establish that Defendants were negligent, the Constitution is not implicated by the negligent

---

[4] It appears Plaintiff was seen on August 16, 2024. (*See* Doc. 9-1 at 6–7).

acts of prison officials. *See Estelle*, 429 U.S. at 106 (stating that allegations of medical negligence do not satisfy the stringent deliberate indifference standard). Accordingly, the deliberate indifference claims against Dr. Baker and Nurse Mathis will be dismissed.

The Court will also dismiss without prejudice the deliberate indifference claim against Cruz. Plaintiff alleges that Cruz was deliberately indifferent solely because he denied Plaintiff's grievances. But denying a grievance or failing to properly process a grievance, without more, does not render a person liable for the underlying constitutional violation. *See Mathews v. Moss*, 506 F. App'x 981, 984 (11th Cir. 2013) (finding the plaintiff failed to state a claim because he merely "alleged that his prison grievances were either ignored or wrongly decided or that prison officials did not properly follow the prison's own grievance procedures"); *Jones v. Eckloff*, No. 2:12-cv-375-FTM-29DNF, 2013 WL 6231181, at *4 (M.D. Fla. Dec. 2, 2013) ("[F]iling a grievance with a supervisory person does not automatically make the supervisor liable for the allegedly unconstitutional conduct brought to light by the grievance, even when the grievance is denied." (collecting cases)). To the extent Plaintiff alleges that Cruz violated his due process rights during the grievance procedure, this claim also fails. *See Moore v. McLaughlin*, 569 F. App'x 656, 659 (11th Cir. 2014) (stating that an inmate cannot base a § 1983 claim on a

13

prison official's response to his grievances because inmates have "no constitutionally protected liberty interest in access to the prison's grievance procedure" (citations omitted)).

Further, to the extent Plaintiff attempts to bring retaliation claims against Dr. Baker and Nurse Mathis, the claims fail. "The core of [a retaliation claim brought pursuant to 42 U.S.C. § 1983] is that the prisoner is being retaliated against for exercising his right to free speech." *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011) (citation omitted). It is firmly established that "an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008). Further, it is firmly established that an inmate may pursue a cause of action against a prison official who retaliated against him for engaging in that protected speech. *Id.*

> To establish a retaliation claim, a prisoner must demonstrate "that the prison official's actions were the result of his having filed a grievance concerning the conditions of his imprisonment." *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003) (internal quotation marks and citation omitted). [A plaintiff] can prevail on a retaliation claim if "(1) his speech was constitutionally protected; (2) [he] suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." *Smith*, 532 F.3d at 1276.

14

*Williams v. Radford*, 64 F.4th 1185, 1192 (11th Cir. 2023) (internal citation modified). As to the third prong, a plaintiff must do more than make "general attacks" upon a defendant's motivations and must articulate "affirmative evidence" of retaliation to establish the requisite motive. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (citations omitted). "In other words, the prisoner must show that, as a subjective matter, a motivation for the defendant's adverse action was the prisoner's grievance or lawsuit." *Jemison v. Wise*, 386 F. App'x 961, 965 (11th Cir. 2010) (citation omitted).

Here, Plaintiff alleges that in retaliation for filing his grievances, Dr. Baker refused to prescribe alternative pain medication, removed his cast prematurely, and refused to provide a new cast and a lower bunk pass; and Nurse Mathis refused to process his sick-call requests and to provide daily wound care. (Doc. 9 at 9–10). But, as stated previously, some of these allegations are inconsistent with Plaintiff's other allegations. Regardless, the Amended Complaint does not include well-pled allegations of fact sufficient to state a retaliation claim against Dr. Baker and Nurse Mathis.

In addition, to the extent Plaintiff attempts to hold any Defendant, such as Minnic, liable based solely on their supervisory positions, "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Cottone*

*v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010). "The standard by which a supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous." *Cottone*, 326 F.3d at 1360. Supervisory liability arises under § 1983 only "when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between actions of a supervising official and the alleged constitutional deprivation." *Id.* As explained in *Cottone*:

> The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." Alternatively, the causal connection may be established when a supervisor's "custom or policy . . . result[s] in deliberate indifference to constitutional rights" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."

*Id.* (internal citations omitted). Plaintiff does not plausibly allege that Minnic was personally involved in any constitutional violations or that there was a causal connection between his conduct and the alleged constitutional deprivations. Plaintiff merely alleges that after the stabbing incident, he was met by "Minnic and other officers who began questioning Plaintiff about the stabbing incident," and when Plaintiff mentioned Fisher, Minnic replied that she was with him. (Doc. 9 at 14). Therefore, insofar as Plaintiff attempts to

hold Minnic liable in his individual capacity solely based on his supervisory position, Plaintiff fails to state a plausible claim for relief.

Furthermore, Plaintiff's official-capacity claims against Fisher, Simpson, and Minnic must be dismissed. Official-capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S 658, 690 n.55 (1978)); *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). Thus, a suit against Fisher, Simpson, and Minnic in their official capacities is equivalent to suing the FDOC itself, but the FDOC is not a "person" within the meaning of § 1983. *Gardner v. Riska*, 444 F. App'x 353, 355 (11th Cir. 2011). Moreover, the FDOC is immune from § 1983 liability for damages. *Zatler*, 802 F.2d at 400. Although injunctive relief may be available against the FDOC, *Gamble v. Fla. Dep't of Health & Rehab. Servs.*, 779 F.2d 1509, 1511 (11th Cir. 1986), Plaintiff fails to plausibly allege that any policy, custom, or practice of the FDOC was the moving force behind his alleged constitutional violations. *See Graham*, 473 U.S. at 166 ("[A] governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation; thus, in an official-capacity suit the entity's policy or custom must have played a part in the violation of federal law." (internal quotation marks and citations omitted));

17

*Monell*, 436 U.S. at 693–94 (concluding that municipal liability under § 1983 occurs "when execution of a government's policy or custom" is "the moving force" behind the constitutional violation). To the extent Plaintiff alleges that Defendants violated, or failed to enforce, their own rules and regulations (*see* Doc. 9-1 at 10–11), Plaintiff does not actually challenge the rules and regulations themselves. *See Mongeau v. JSO*, 197 F. App'x 847, 852 (11th Cir. 2006) (affirming the dismissal of the official-capacity claims against defendants where plaintiff alleged defendants failed to properly follow their procedures but did not challenge the procedures themselves).

Likewise, Plaintiff's official-capacity claims against Dr. Baker, Nurse Mathis, and Cruz must also be dismissed, even assuming they were sufficiently pled. First, to the extent Plaintiff alleges that Dr. Baker, Nurse Mathis, and Cruz were employed by the FDOC (*see* Doc. 9 at 6), his official-capacity claims for monetary damages against these Defendants must be dismissed as barred by the Eleventh Amendment. *See, e.g., Siskos v. Sec'y, Dep't of Corrs.*, 817 F. App'x 760, 766 (11th Cir. 2020) (finding "the Florida AG, the State, and FDOC are all entities of the State of Florida," which "are immune from suit for money damages under the Eleventh Amendment"). Further, to the extent Plaintiff brings official-capacity claims against Dr. Baker, Nurse Mathis, and Cruz as employees of Centurion Health Services ("**Centurion**") (*see* Doc. 9 at 6), these

claims must be dismissed for failure to state a plausible claim for relief. Where a claim of deliberate medical indifference is brought against a private contractor based on its functional equivalence to a government entity, liability under § 1983 cannot be based on a theory of respondeat superior. *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (citation omitted). Instead, the plaintiff must show that the entity "had a 'policy or custom' of deliberate indifference that led to the violation of his constitutional right." *Id.* (citing *Monell*, 436 U.S. at 694). A government entity rarely will have adopted an official policy that permits a particular constitutional violation; therefore, most plaintiffs proceed under a theory that the government entity has an unofficial custom or practice of permitting the alleged violation. *See Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1330 (11th Cir. 2003); *Craig*, 643 F.3d at 1310. Allegations of an unconstitutional custom or practice cannot be conclusory. *See Rankin v. Bd. of Regents of the Univ. Sys. of Ga.*, 732 F. App'x 779, 783 (11th Cir. 2018). Instead, a plaintiff must allege facts "show[ing] a persistent and widespread practice." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1332 (11th Cir. 2007) (quoting *Depew v. City of St. Mary's, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986)). "A single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several employees." *Craig*, 643 F.3d at 1311; *see also Grech*, 335 F.3d at 1330 n.6 ("A single incident would not be

so pervasive as to be a custom or practice."). Here, Plaintiff does not plausibly allege that any constitutional violation was attributable to a Centurion policy or custom. Thus, the official-capacity claims against Dr. Baker, Nurse Mathis, and Cruz must be dismissed.

Based on the foregoing, the Court will dismiss without prejudice all claims in the Amended Complaint except the individual-capacity claims of failure to protect or intervene against Fisher and Simpson. As there are no medical deliberate indifference claims remaining, Plaintiff's Motion seeking an injunction to compel a medical examination of Plaintiff's right hand will be denied as moot. The Motion is also improper because, among other deficiencies, it does not seek to preserve the status quo. *See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1284 (11th Cir. 1990) ("The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated."). "When a preliminary injunction is sought to force another party to act, rather than simply to maintain the status quo, it becomes a 'mandatory or affirmative injunction' and the burden on the moving party increases." *Haddad v. Arnold*,

784 F. Supp. 2d 1248, 1295 (M.D. Fla. 2010) (quoting *Exhibitors Poster Exch. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971)[5]).

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1.      The Amended Complaint (Doc. 9) is **DISMISSED without prejudice** as to all claims **except** the individual-capacity claims of failure to protect or intervene against Sergeant R. Fisher and Correctional Officer Trainee Simpson.

2.      The Clerk of Court shall **terminate** Captain Minnic, Dr. Baker, Nurse Mathis, and Medical Director Felix Cruz as Defendants in this case.

3.      A separate Order will enter regarding service of process on Sergeant R. Fisher and Correctional Officer Trainee Simpson.

4.      The Motion (Doc. 10) is **DENIED**.[6]

---

[5] All Fifth Circuit decisions entered before October 1, 1981 were adopted by the Eleventh Circuit as binding precedent. *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[6] Plaintiff's nearly-identical Motion for Preliminary Injunction (Doc. 8), filed before the filing of the Amended Complaint, is **TERMINATED**.

**DONE AND ORDERED** at Jacksonville, Florida, this 14th day of April, 2026.

JORDAN E. PRATT
UNITED STATES DISTRICT JUDGE

Jax-11
c:
Tyvon Elisias, #L77891